## KOENIG v. RIO BRAVO OIL CO. et al.*
### (No. 7303.)

Court of Civil Appeals of Texas. Austin. Feb. 8, 1929.

Rehearing Denied March 6, 1929.

C. F. Richards, of Lockhart, and E. W. Clemens and Terrell, Davis, Huff & McMillan, all of San Antonio, for appellant.

Tom Gambrell and Fred L. Blundell, both of Lockhart, and Hart, Patterson & Hart, of Austin, for appellee Kissick.

McCLENDON, C. J. Koenig sued Rio Bravo Oil Company, Kissick, and Hickman for $1,500, the value of one-eighth of the first oil produced from well No. 1 on the 30-acre Tiller lease in Caldwell county. The oil company admitted owing the money either to Koenig or Kissick, deposited it in the registry of the court, and asked to be discharged of liability. Upon a trial to the court, without a jury, Kissick recovered the money. Koenig has appealed.

The controversy grew out of the following facts (stated chronologically), which are without substantial dispute:

July 22, 1924, Miles and Finnell (who then owned in equal shares the Tiller lease) made a drilling contract with Hickman, under which he was to receive $12,000 for drilling a well on the lease, $4,000 of which was payable in cash when the contract was completed, and $8,000 was "payable in oil only from ¼ of the production as the oil is produced and saved from the Tiller well No. 1." This contract was recorded in the mechanic's lien records of Caldwell county. August 12, 1924, Hickman and Kissick made a contract which was filed in the chattel mortgage records of Caldwell county, and which furnishes the basis of Kissick's claim. As the questions presented involve the legal effect of this contract, we quote it in full:

"This memorandum witnesseth that M. J. Kissick, hereinafter called Seller, in consideration of One Dollar to him in hand paid, and of the further sum hereinafter agreed to be paid by C. F. Hickman, hereinafter called Buyer, hereby bargains, sells and delivers to buyer the following described personal property, to wit:

"2200 feet of Four (4) inch National Up-set Drill Stem with Hickman Tool Joints.

"In consideration for which the Buyer promises to pay to seller the sum of Fifteen Hundred and no/100 ($1500.00) Dollars, said sum to be paid out of the one-eighth (⅛) of the first oil run from the W. J. Tiller 30-acre lease, said thirty acre lease being located in the northeast corner of the W. J. Tiller 300-acre tract of land adjoining the Proctor lease on the south and east and the Merriweather lease on the north and east, and being a part of the John Henry league in Caldwell County, Texas.

"Should there be no oil discovered on said 30-acre lease, then and in that event, the Buyer promises and obligates himself to return said drill stem to said Seller in as good condition as when received less ordinary wear and tear.

"It is expressly provided that the title to the above described property is retained by and in seller until the full payment of the above obligation by Buyer; and if buyer shall fail to pay such obligation in full when due, then seller shall have the right, and is hereby authorized and empowered, to take and resume possession of, and remove into such possession, any and all of the above described property, wherever found; said Buyer hereby waiving any claim or action for trespass or damage on account of said taking. In case seller resumes such possession, Buyer shall be no further liable on the above obligation and Seller may keep or dispose of such property as such seller may choose, or, instead of resuming possession of such property in satisfaction of Buyer's obligation as above described, seller in case of default shall have the option (no expression thereof being required) to treat this instrument as a chattel mortgage, and either with or without suit, court proceedings, or process, shall have a right individually or through agency to take possession of any or all of the above described property wherever it may be found, without any liability for damages or other claim whatever, and remove and sell the same either at public or private sale at such time and place as seller shall choose, apply-

ing the proceeds of such sale as a credit upon such obligation, without prejudice to further enforcement of any balance of such obligation remaining due, and in case such proceeds exceed the amount due upon such obligation, returning the balance to Buyer."

At some date not stated, the United North & South Oil Company brought suit against Miles and Finnell, seeking to establish a superior right to the mineral title covered by the lease. Hickman intervened, asserting his interest in one-fourth of the oil produced from well No. 1. This well was brought in as a producer on October 28, 1924, and another well, No. 2, was in like manner brought in on April 1, 1925. March 30, 1925, judgment was rendered in the United Oil Company's suit, denying to it recovery, and establishing Hickman's right to $6,800 out of one-fourth of the first oil then or thereafter produced from well No. 1. This judgment was appealed from and later affirmed. That portion of the judgment in favor of Hickman was rendered upon the recital that "Miles and Finnell had confessed to the justness of the cause of action asserted by" him. The oil from both wells No. 1 and No. 2 was run into the pipe line of the Rio Bravo Oil Company, which had notice of the Kissick claim, but the record does not show that any separate accounting was kept of the amount of oil from each well. December 2, 1925, Finnell assigned to Koenig his interest in the lease and all oil held by the Rio Bravo Company. December 18, 1925, Miles made a like assignment of his interest to Carter, Townes, and Richards. This assignment recited that it was subject to the oil company's suit, "and the said grantees herein accept the same subject to the indebtedness that the interest of the grantor herein may be subject to or liable for." February 19, 1926, a receiver was appointed in that suit, and from that time on he collected the proceeds of the oil from the Rio Bravo Company. There had been up to that time produced and delivered to the Rio Bravo Company from the two wells a total of $17,811.85 in oil. By three separate instruments, in June and July, 1927, the interests of Carter, Townes, and Richards passed to Koenig. Koenig asserts the following four propositions under which he claims ownership of the fund in suit:

"1. Oil embedded in and under a designated tract of land is a part of the realty and can not be sold or conveyed by a mere bill of sale or chattel mortgage, because a conveyance of oil in place requires all the formalities of a conveyance of any other interest in real estate. A bona fide purchaser, for value, without notice, of the oil lease on such designated tract of land and the oil produced therefrom, therefore takes title free and clear of the interest in, or claim to, the oil asserted under an alleged bill of sale or chattel mortgage executed prior to the drilling of a well

and prior to the production of oil from the lease."

"2. A bill of sale or chattel mortgage purporting to convey oil embedded in a certain tract of land can, at most, be an executory contract to sell or mortgage and will not transfer or convey title if oil is subsequently produced and saved."

"3. A contract payable in oil is not a present sale of the oil, so title does not pass and the obligor can refuse to perform, whereupon his promise will become payable in money."

"4. Even if a bill of sale of, or chattel mortgage on, an interest in oil embedded in a certain tract of land should be held to transfer title as oil is thereafter produced and saved from such tract of land, a judgment rendered by a court of competent jurisdiction adjudicating the title and claims will merge the right to such oil in the decree foreclosing the lien upon the entire lease, and will terminate the right to receive, and prevent the passing of title to, any oil thereafter produced."

We will dispose of these propositions by a statement of our conclusions as to the legal effect of the transactions disclosed by the record.

Whatever may have been the legal effect of the drilling contract with reference to the rights of Hickman to be paid out of one-fourth of the first oil produced and saved from Tiller well No. 1, the judgment established his right to such payment and expressly decreed a lien on the oil as security for his claim. At the time this judgment was rendered, Miles and Finnell (who were parties to the judgment) were the owners of the lease and of seven-eighths of the oil that had theretofore been produced therefrom. Kissick was not a party to, and according to his testimony had no knowledge of, the suit until after all of the rights herein in issue had been fixed.

As we construe the contract between Kissick and Hickman, it amounted in effect to a conditional sale of the drill stem in consideration of an assignment of Hickman's interest in $1,500 worth of one-eighth of the first oil produced from Tiller well No. 1. The effect of this assignment was to transfer to Kissick the rights or interests of Hickman in the oil pro tanto.

We do not concur in the construction contended for by appellant that this was merely a contract to pay a specified sum of money out of a given fund or property, the breach of which would only give rise to a personal action against the party contracting for the amount of money to be paid. The instrument expressly provided that if oil were not discovered on the lease Hickman might return the drill stem in as good condition as when received, less ordinary wear and tear. Clearly this showed that the parties did not intend to create a personal obligation on the part of Hickman to pay for the drill stem; but

that they did intend that an interest in the oil should pass. We attach no importance to the subsequent provisions of the instrument in so far as they affect the question under consideration. They were merely alternative rights of Kissick under contingencies which did not arise. The manifest intention of the parties, both from the language of the instrument and from the surrounding circumstances, was to assign to Kissick an interest in the oil if and when produced from the lease, and this intention effectuated such assignment to the extent of Hickman's interest in the thing attempted to be assigned, which, under the judgment, was a lien interest in the oil then or thereafter produced. Davis & Groggin v. Bank (Tex. Civ. App.) 156 S. W. 321 (error refused).

Nor do we attach any importance to the fact that at the time the instrument was executed the oil was under the ground, a part of the realty, and not in esse as personalty. It was admitted that at the time this instrument and the drilling contract were executed the Tiller tract was in a proven field with producing wells in close proximity to its lines. The property, though not then in esse as personalty, and though not then owned by Hickman, was in contemplation of the parties both as to existence and as to ownership or interest; and the rights and interests which the instruments purported to create attached when the oil was brought to the surface. The leading case in this state on the question involved in this holding is Richardson v. Washington, 88 Tex. 339, 31 S. W. 614.

The instruments were sufficient, between the parties and as to all persons with knowledge or notice, to fix the rights of Kissick whenever the oil was brought to the surface. The judgment established the rights and lien of Hickman; and the chattel mortgage of Kissick was notice to every one dealing with the interest of Hickman in any event from the time oil was brought to the surface and became personalty.

Koenig never acquired any interest superior to Hickman, and the Rio Bravo Oil Company had knowledge of Kissick's claims.

No question therefore of innocent purchaser is involved.

The contention is made that there was no showing that one-eighth of oil produced from the Tiller well No. 1 up to the time of the acquisition of their interest in the lease by Koenig and his assigns, Carter et al., amounted to $1,500. The agreement of the parties shows that up to the time of the receivership one-eighth of the oil from the two wells amounted to more than enough to discharge Kissick's claim. Neither Hickman nor Kissick was responsible for the intermingling of the oil from the two wells, and as this intermingling was done by or under the authority of those charged with knowledge of Hickman's and Kissick's claims, it follows that the burden rested upon Koenig to show that the amount produced from well No. 1 was insufficient to discharge the full amount of Kissick's claim. The judgment which was binding on Koenig established Hickman's lien on the oil then or thereafter produced. This lien attached to the oil which was produced prior to the receivership, regardless of the effect of the receivership on that afterwards produced and taken over by the receiver, Kissick's rights attached, as assignee of Hickman, as soon as the oil became personalty; and Koenig was charged with notice of those rights by virtue of the registration.

Independently of this holding, however, we further hold that the issue presented in the last-stated contention of appellant is foreclosed by an agreement of the parties which admitted that: "The one-eighth of the production mentioned in the instrument between the defendant Hickman and the defendant Kissick, to the extent of $1,500, was also received by the defendant Rio Bravo Oil Company, and is the same oil and money derived therefrom, as is now in the hands of the District Clerk, or the register of this court, and is the money that is in litigation between the various parties to this suit."

We think the trial court rendered the proper judgment, which judgment we affirm.

Affirmed.